**Lila F. Laux, PhD**
**Human Factors Consulting**
417 Leyden St.
Denver, CO 80220
(303) 388 4659

March 13, 2017

Richard Shenkan
Shenkan Injury Lawyers, LLC.
6550 Lakeshore St.
West Bloomfield, MI 48323

Re: *Jeffers v. American Honda Finance Corp.* – *No. 15-3181. U.S. Dist. Court, E.D. of Pennsylvania*

Dear Mr. Shenkan:

You have asked me to perform a human factors analysis of certain notices that American Honda Finance Corporation ("Honda") sent to consumers in connection with the repossession of vehicles it had financed and to provide you with an opinion as to whether or not the communication is understandable and adequately communicates the consumer's rights and obligations. This letter serves as my report.

I have a doctorate in Industrial Psychology in Human Factors from Rice University in Houston, Texas and a Master of Science degree in Applied Psychology from the University of Southwest Louisiana at Lafayette (now the University of Louisiana at Lafayette). I was on the faculty and research staff in the Department of Psychology at Rice University from 1986-1994, where I taught Human Factors courses and carried out applied human factors research. I was also on the staff and faculty in the Department of Community Medicine at Baylor College of Medicine from 1981-1994, where I did human factors research. I have also taught in the Human Factors short course for professionals at the University of Michigan Ann Arbor and have taught Human Factors Engineering in the Computer Science department at the University of Colorado Denver.

Research we performed in the Human Factors laboratory at Rice focused on the characteristics of effective warnings, labels, and instructions, and how to effectively communicate risk information to product purchasers and users. During the time I was on the faculty at Rice I was the lead researcher on three contracts with General Motors and four contracts with the AAA Foundation to examine human factors issues associated with capabilities of drivers, warnings and instructions, and the location of controls and displays. The work we did for General Motors resulted in a Manual for GM employees delineating how to determine when warnings are needed and how to develop, locate and evaluate the effectiveness of those warnings. The results of this work and guidance in developing and evaluating appropriate warnings in vehicles are presented in A Human Factors Approach to Developing Facilitators (Warnings and Instructions), a chapter in a book titled *Automotive Ergonomics* (for the full citation, see my CV).

In 1994, I left academia and worked for eight years as a Human Factors Engineer for a large telecommunications company, where my responsibilities were the design of work interfaces and practices


EXHIBIT 1

for employees. I left that position in 2001 and now work as a Principal Human Factors Engineer for a firm that provides human factors research and consultative services to the military, government, public service organizations, and private business.

For 20+ years I taught a class for manufacturers and distributors in the Department of Engineering Professional Development at the University of Wisconsin, Madison. The class, titled "The Role of Warnings and Instructions" focuses on developing and evaluating written communications, including warnings and instructions. Hundreds of product manufacturers and distributors have attended this course, which instructs them regarding:

- processes for the identification of the hazards associated with owning/using a product;
- how to determine the characteristics of the expected consumers/users of their product who will be exposed to any hazards associated with the use of the product;
- how to determine the information needs of the exposed population with regard to appropriate product use and the hazards associated with its use;
- how to identify and address common misconceptions regarding the use of their products,
- how to prevent inadvertent incorrect use or foreseeable misuse of the product;
- how to develop and test warnings and instructions and other facilitators such as advertising and training materials; and,
- how to evaluate the effectiveness of their instructions and warnings in informing and motivating purchasers and consumers/users of the product.

In this course, I also provided manufacturers with a checklist to help them evaluate what information is necessary, and determine whether the design, placement, and effectiveness of the information is adequate. I also taught them how to develop appropriate evaluation methods to assess the effectiveness of the information they provide with their products.

I have qualified and testified as an expert in state and federal courts on these issues and have authored or co-authored a number of publications regarding the development of effective warnings and instructions and communicating hazard and risk information. I have written chapters included in four human factors books that are used for teaching and to guide human factors research. These publications and other relevant papers and presentations are listed in my C.V., which is attached.

As a human factors psychologist – also referred to as a human factors engineer and/or cognitive engineer – my day-to-day job is to apply the principles of cognitive psychology and human factors engineering/ergonomics to the design of products and systems to be used by humans and the communication requirements associated with these products (e.g., product labeling, on-product warnings, packaging information, information in manuals, dear customer letters, alerts), instructions and advertising. I also consult with private companies regarding the development and evaluation of warning systems for their products. In addition, I spend some of my time assisting lawyers and parties in litigation.

The unique expertise of people trained as Human Factors psychologists or cognitive engineers is our in-depth understanding of human behavior and the factors that influence, or shape, human behavior. We are concerned with how people detect, process, understand, and evaluate complex information, how they

2

judge the likelihood that they are exposing themselves to a hazard, and how their beliefs about a product or system shape their behavior related to the products they purchase and use. Human Factors engineers:
   a) evaluate how a consumer/user's perceptual and cognitive abilities, beliefs, and experiences shape his or her ability to make appropriate decisions regarding the use of products and the potential for hazardous interactions;
   b) analyze the factors that shape the consumer/user's decisions and behavior; and,
   c) bring to bear an understanding of the human to guide designers and developers of product information and warning materials.

Human Factors specialists integrate understanding of human behavior with knowledge of how people make decisions to develop appropriate communications that alert and inform at-risk consumers. The information provided must be salient, understandable and informative.

In my human factors analysis of the Honda letters addressed to Mr. Jeffers, I applied essentially the same analytical methods and procedures that I use when providing human factors services for the military, nuclear power, automobile, and aerospace industries. Those methods are basic to the science of human factors/cognitive engineering. In order to develop an opinion, I have reviewed the following material that you provided to me:
- The Second Amended Class Action Complaint filed in the above-captioned matter; and,
- Various documents produced by Honda, including Mr. Jeffers' retail installment contract.

**Case background:** In May, 2012, Robert Jeffers purchased a new Honda Accord and financed a portion of the purchase price with Honda. On July 26, 2013, Honda repossessed the car. Honda then sent two one-page letters (or post-repossession disclosures) to Mr. Jeffers, in the same envelope, to alert him of his post-repossession consumer rights such as his right to and amount required to redeem (or buy back) his repossessed vehicle. There has been some dispute as to whether both notices were actually sent and whether they were sent together in the same envelope, which Honda states it is its common practice. For purposes of my analysis, I have assumed that a Notice of Repossession-Redemption ("NRR," attached as Exhibit A) and a Notice of Our Plan to Sell Property-Private ("NOPS," attached as Exhibit B) were mailed to Plaintiff together in the same envelope on the date shown on each, July 29, 2013.

Mr. Jeffers' Retail Installment Sales Contract ("RISC") states:
> If Seller repossesses the Vehicle without legal process, Seller will send Buyer a notice of repossession. **Buyer may redeem the vehicle** or, if Seller allows, reinstate this Contract, at any time up to 15 days after Seller mails this notice ***and until:* (1) Seller disposes (or contracts to dispose) of the Vehicle** or (2) Seller retains the Vehicle in satisfaction of Buyer's debt, as described below. (Emphasis added).

## ANALYSIS

### A. *Honda's RISC*

According to the RISC, as applicable to the facts at issue, Honda provided Mr. Jeffers with a *minimum* redemption period of 15 days as from the date of the mailing of the Notice of Repossession to redeem his vehicle and a *maximum* redemption deadline through the time Honda sells the vehicle.

3

### B. *Honda's Use of Two Separate and Distinct Disclosures Notices (the NRR and NOPS) Enclosed in One Envelope is Confusing*

Honda sent Mr. Jeffers two one-page disclosure notices in the same envelope. Each notice had the appearance of a separate and distinct letter – with two salutations and dates; each setting forth a *different* deadline for redemption; each noting a different addresses and phone numbers for customer service. The presentation of these disclosures is organized and designed in such a manner that causes confusion. A recipient is not able to discern which notice is accurate in light of the conflicting information and may reasonably believe that Honda made a mistake by sending two letters in the same envelope. These disclosures fail to clearly state, in an easy-to-read and understandable format, what length of time the recipient has, or may have, to redeem his repossessed vehicle and how much money he must pay to redeem his vehicle.

### C. *Honda's Disclosures Relating to Redemption Rights are Confusing, Contradictory and Misleading*

1. NRR Disclosure Notice

The NRR states: "You have the right to redeem the motor vehicle by paying in full the indebtedness evidenced by the contract **until** the expiration of 15 days from the mailing of this notice." It also states: "If you do not redeem the motor vehicle, we intend to resell the motor vehicle at the *expiration* of 15 days from the date of the giving of this notice. The 15 day period will *expire* August 15, 2013." The use of the phrases "*until* the expiration of 15 days", "will expire", and "*at* the expiration of 15 days," signifies that the vehicle will be sold and the redemption period will end *precisely* at the end of 15 days.

However, when the 15 day period runs is also confusing and contradictory. The statement "we intend to resell the motor vehicle at the **expiration** of 15 days from the date of the giving of this notice"—which is August 13, 2013—is followed immediately by the statement that "[t]he 15 day period will expire August *15*, 2013." After reading these statements, the reader would be unable to discern whether the vehicle could be redeemed after August 13, 2013 or August 15, 2013.

This representation, however, was false, misleading, and incorrect, because the vehicle was not sold until September 17, 2013. Based on the representation in the NRR, there is no adequate warning of this trigger date for the loss of his redemption right.

2. NOP Disclosure Notice

Contrary to the NRR disclosure, the RISC makes clear that Jeffers had the right to have redeemed his repossessed vehicle through the point in time Honda sells the repossessed vehicle, here, September 17, 2013. Also in contradiction to the NRR which states that the vehicle would be sold "*at* the expiration of 15 days," the NOPS states "we will sell it [the motor vehicle] at a private sale *sometime after* August 15, 2013." The NOPS also declares that "[y]ou are entitled to the property back *at any time before we sell it...*," in contradiction to a 15 day period as stated in the NRR.

4

A reasonable consumer of these two disclosure notices, in the manner presented in a single envelope, could reasonably believe that he or she had just 15 days to redeem his or her vehicle and not understand that the redemption period actually extended through the time Honda would sell the vehicle.

### D. *Honda's Terminology in the Notices for the Amount Required to Redeem is Confusing*

The amount required to redeem the repossessed vehicle is also confusing. The NRR states that the amount that must be paid to redeem the vehicle is "the indebtedness evidenced by the contract." The NOPS, on the other hand, explains that redemption requires the borrower to make "the full payoff amount, including our expenses." Neither "the indebtedness evidenced by the contract," nor the "full payoff amount, including our expenses" is defined. This terminology is not defined and confusing. Both refer to the amount required to redeem but they refer to different amounts. The NOPS does quantify the "full payoff amount," (although not clearly either including or excluding "our expenses") as $22,858.43. However, the NRR labels the same amount, $22,858.43, as the "TOTAL AMOUNT DUE," leaving open the possibility that "TOTAL AMOUNT DUE," the "indebtedness evidenced by the contract" and the "full payoff amount" (either with or without "our expenses") are all the same, as well as the possibility that they are defined differently and just happen to have the same value.

### E. *The Intent of the NRR and the NOPS is to Inform but They are Inadequate Communications*

The intent of the NRR and the NOPS is to inform people whose vehicles have been repossessed of their rights with regard to the vehicle, but these documents fail as adequate communications. Consumer disclosures such as the NRR and NOPS should have used more common, shorter words and sentences and avoided technical terms. The should not have employed deceptive, confusing, and contradictory statements as referenced as to the redemption periods discussed above. The language level and contradictory statements of the NRR and NOPS Disclosures, combined with the length of the sentences and the selection of terms result in an elevated reading level (Gunning Fog = 14.08 or college level; Flesch-Kincaid = 11.41 or High School 12th grade level). The reading level score shows the relative difficulty of text on a continuum from easy (grade 4–6) to very hard (grade 13 and above – college level). The average reading level of American adults is about 7th to 8th grade level. Studies have shown that a large percentage of the US population is functionally illiterate and do not read and comprehend text written at these reading levels (National Assessment of Adult Literacy, https://nces.ed.gov/NAAL/kf_demographics.asp; Literacy in the United States; https://en.wikipedia.org/wiki/Literacy_in_the_United_States). About 12% of the US population are foreign born and do not typically have English as their primary language (The Foreign-Born Population in the United States, US Census Bureau 2011) and would be unlikely to comprehend these documents. Because of the elevated reading level, it is foreseeable that many readers of the NRR and NOPS will fail to comprehend that they have until the vehicle is sold by Honda to redeem their vehicle and they would be unable to determine exactly how much they would have to pay to redeem it.

### CONCLUSION

It is my opinion that, for the foregoing reasons, the disclosures Honda sent to Plaintiff were inadequate communications from a human factors perspective. The combination of the NRR and NOPS Disclosure Notices are confusing to those on a consumer level. It is not reasonable to send conflicting,

5

confusing disclosure notices. I state this opinion within a reasonable degree of professional certainty. I reserve the right to supplement this report as additional information becomes available.

Sincerely,

*Lila F. Laux*

Lila F. Laux, PhD



**HONDA**
**Financial Services**

July 29, 2013

Robert M. Jeffers
5436 Youngridge Dr. Apt. 7
Pittsburgh, PA 15236

## NOTICE OF REPOSSESSION - REDEMPTION

Re: Account Number 153852879

Dear Robert M. Jeffers:

Please be advised that we on July 26, 2013 repossessed the motor vehicle identified below because of your default under the terms of the Retail Installment Contract entered by you on May 24, 2012. Your obligations under the retail installment contract are secured by the personal property: 2012 Honda Accord 1HGCP2F36CA056322

You are in default by reason of your failure to pay the installment(s) due: 5/15/13.

You have the right to redeem the motor vehicle by paying in full the indebtedness evidenced by the contract until the expiration of 15 days from the date of mailing this notice. The following itemizes the contract balance, delinquency, collection and repossession costs as of the date of this notice:

| | | |
|---|---|---|
| Contract balance: | = | $21,277.31 |
| Past due payments: | + | 1,223.46 |
| Late fees: | + | 32.66 |
| Repossession fees: | + | 325.00 |
| Other | + | 0.00 |
| Other | + | 0.00 |
| Other | + | 0.00 |
| Less unearned interest, if applicable: | - | |
| Less unearned insurance premium, if applicable: | - | |
| TOTAL AMOUNT DUE: | = | $22,858.43 |

A separate storage fee of 15.00 per day will be charged by the repossession agent.

The TOTAL AMOUNT DUE is the amount due as of July 29, 2013; this amount may change.

If you do not redeem the motor vehicle, we intend to resell the motor vehicle at the expiration of 15 days from the date of the giving of this notice. The 15 day period will expire August 15, 2013.

The motor vehicle is being stored at American Recovery, 2525 Fifth Avenue, Mckeesport, PA 15132 where it may be inspected by appointment during normal business hours.

Any personal property left in the vehicle will be held for thirty (30) days from the date of the mailing of this notice. The personal property may be reclaimed within the thirty (30) day time period. Thereafter, we may dispose of the personal property in the same manner as the vehicle.

Payment to redeem should be sent to and an appointment to inspect made with, or any questions inquired of, the following officer: Recvoery Department, 201 Little Falls Dr, Wilmington, DE 19808 Telephone: (800) 916-9931.

Sincerely,

Honda Financial Services

## ANSWERS TO REQUESTS FOR ADMISSIONS WITH COMPANION REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES

1. The NOTICE OF OUR PLAN TO SELL PROPERTY-PRIVATE sent to Jeffers states, in part:

"As of the date of this letter, the payoff amount is $22,858.43...."
and

The NOTICE OF REPOSSESSION-REDEMPTION sent to Jeffers states, in part:

"TOTAL AMOUNT DUE: = $22,858.43"
and
"The TOTAL AMOUNT DUE is the amount due as of July 29, 2013."

Admit that, if Jeffers had redeemed his vehicle on July 29, 2013, he would have had to pay YOU $22,858.43.

**ANSWER:** Admitted.

2. Admit that, within the calculation of $22,858.43, YOU included a charge entitled "Repossession fees" in the amount of $325.00.

**ANSWER:** Admitted.

3. Admit that, if Jeffers redeemed his vehicle any time from and including July 30, 2013 through and including August 13, 2013, YOU would have charged Jeffers $325.00 for the "Repossession fees" (as that term is used in the NOTICE OF REPOSSESSION-REDEMPTION) in addition to other amounts YOU deemed to have been owed.

**ANSWER:** Admitted.

4. Admit that the $325.00 for "Repossession fees" (as that term is used in the NOTICE OF REPOSSESSION-REDEMPTION), refers to an actual cost paid by YOU in connection with the repossession of Jeffers' vehicle.

**ANSWER:** Admitted.



EXHIBIT 2

8

## ANSWERS TO INTERROGATORIES

1. IDENTIFY all vehicle auctions located within a 275-mile radius of 5808 Curry Rd., Unit A, Pittsburgh, PA 15236 (Jeffers' residence at time of repossession) where YOU have sold, leased, or disposed of any vehicles which YOU or YOUR agent(s) have repossessed at any time from January 1, 2013 through September 17, 2013.

**ANSWER:** The following auction sites are responsive to this interrogatory:

- ADESA Cincinnati/Dayton
- ADESA PA
- ADESA Washington, DC
- Complete Auto Auction
- Manheim Detroit
- Manheim PA
- TRA Central Penn

Honda determined the auction site to which to send Plaintiff's vehicle based on which site was likely to maximize the sale price of the Vehicle, net of expenses, to the mutual benefit of Honda and Plaintiff.

2. Please state:

| the amount that Jeffers would have had to pay to YOU in order to redeem his vehicle on: | August 12, 2013 | August 16, 2013 | September 16, 2013 |
|---|---|---|---|
| "the full payoff amount, including our expenses" [1] on: | | | |
| "the indebtedness evidenced by the contract" [2] on: | | | |
| "the total amount of our indebtedness" [3] on: | | | |
| "the total amount of our indebtedness *plus expenses*" [3] on: | | | |

[1] From "Notice of Our Plan to Sell Property-Private" letter   [2] From "Notice of Repossession-Redemption" letter   [3] From YOUR Answer to ¶41 of 2nd Am. Complaint

**ANSWER:** Honda objects to interrogatory 2 because it calls for speculation. If a customer seeks to redeem his repossessed vehicle on a particular date, Honda will calculate the redemption amount as of that date based on the amount of the customer's outstanding loan balance, the recoverable expenses Honda has incurred as of that date, and applicable law. Honda's vendors may also charge expenses to Honda that may be passed on to the customer as part of the redemption amount. For example, an auction site may charge additional storage, administrative, or transportation fees if a repossessed vehicle is redeemed before it has been sold. Calculating the redemption amount requires Honda to gather information from these third-party

EXHIBIT 3